BOSTON EDISON COMPANY *vs*. BOARD OF ASSESSORS
OF BOSTON.

Suffolk. December 8, 1987. — March 21, 1988.

Present: HENNESSEY, C.J., WILKINS, LIACOS, & LYNCH, JJ.

*Taxation*, Real estate tax: assessment, abatement, classification of property,
value; Personal property tax: value, machinery, public utility; Appellate
Tax Board: findings. *Boston*. *Value*. *Evidence*, Value, Reproduction
cost, Replacement cost.

There was no substantive issue of merit presented by the contention of a
city's board of assessors, in a proceeding before the Appellate Tax Board
to determine proper real estate tax assessments on property owned by a
public utility, that the utility's applications for abatement failed to raise
any claim that the assessors had misclassified the utility's generating
plant as real estate. [6]
On appeals from a decision of the Appellate Tax Board concerning local real
estate tax assessments on a generating plant owned by a public utility,
this court, without deciding whether the board properly could have ruled
that the utility's petitions to the board failed to raise any claim that a
city's board of assessors had misclassified the utility's generating plant
as real estate, concluded that, at the hearing before the board, the asses-
sors were neither unfairly surprised nor thought themselves prejudiced
by the utility's argument and that, in its discretion, the board properly
considered the issue. [6]

A public utility's including its electrical generating machinery and equipment on lists of personal property it filed annually with a city's board of assessors pursuant to G. L. c. 59, § 29, without objection by the assessors, did not make binding the utility's characterization of the property as personal property so as to prevent the assessors from challenging the status of the plant in a proceeding before the Appellate Tax Board to determine proper real estate tax assessments on property owned by the utility. [6-7]

In a proceeding to determine the proper real estate tax assessments on property owned by a public utility in the city of Boston, the Appellate Tax Board (board) properly treated the utility's electrical generating machinery and equipment (the plant) as real estate for the purpose of deciding the fair cash value of the utility's real estate at the Boston location, where the board's treatment of the plant could be supported on the theory that the city's board of assessors had discretion to tax the plant either as personal property (because it was machinery used in manufacture) or as real estate, and that they had in fact assessed the plant as real estate. [7-12]

In a proceeding to determine the fair cash value of a public utility's taxable real property consisting of electrical generating machinery and equipment located in Boston, substantial evidence supported the Appellate Tax Board's decision to give equal weight to the net book cost of the property in question (not including the land on which it was situated) and the property's depreciated reproduction cost. [12-16]

On remand of a decision concerning local real estate tax assessments on a public utility's generating plant, the Appellate Tax Board, after considering the utility's evidence of depreciated replacement costs which the board had apparently overlooked, was to decide whether portions of the plant would be replaced by other forms of equipment, rather than reproduced, and, if the difference in costs was significant, the fair cash value of the equipment was to be recalculated using replacement, rather than reproduction, costs. [16-17]

On appeals from a decision of the Appellate Tax Board concerning local real estate tax assessments on a generating plant owned by a public utility and located on land in Boston, approximately twenty-five percent of which was owned by the Commonwealth and occupied by the utility under revocable licenses, this court remanded the proceedings to the board (1) to reconsider the value of the land in light of its conclusion as to the effect of language in G. L. c. 59, § 2B, providing that the statute, which permits local taxation of certain public land, shall not apply to "easements, grants, licenses or rights of way of public utility companies" and (2) to explain its reasons for selecting the land value it ultimately established. [17-18]

On appeals from a decision of the Appellate Tax Board concerning local real estate tax assessments on a generating plant in Boston owned by a public

utility, this court remanded the proceedings to the board to reconsider its findings and rulings on certain disproportion ratios used by the board, which were prepared for Boston by the Department of Revenue pursuant to G. L. c. 58, §§ 10-10C, and, on remand, the board was to give no special weight to the department's ratios, as against the utility's evidence on the same subject, in the absence of a showing of uniform treatment of Boston taxpayers seeking abatements on the ground of disproportionate assessments. [18-19]

APPEALS from a decision of the Appellate Tax Board.

The Supreme Judicial Court granted a request for direct appellate review.

*George Marshall Moriarty* (*Harvey J. Wolkoff* with him) for the taxpayer.

*Walter H. McLaughlin, Jr.* (*Michael Eby* with him) for the Board of Assessors of Boston.

WILKINS, J. We deal with cross appeals from a decision of the Appellate Tax Board (board) concerning local real estate tax assessments on property of the Boston Edison Company (Edison) on Summer Street in South Boston for the six tax years 1977 through 1982. The board's decision granted Edison abatements averaging approximately $6,000,000 for each of the tax years 1977, 1978, and 1979, and slightly more than $900,000 for the 1981 tax year. The board granted Edison no abatements for the 1980 and 1982 tax years.

There are two major areas of disagreement between the parties. The first is whether the board properly treated Edison's electrical generating machinery and equipment as real estate for the purpose of deciding the fair cash value of Edison's real estate at the Summer Street location. We shall refer to that machinery and equipment collectively as the generating plant or sometimes as simply the plant. We agree with the board that, for the purposes of this proceeding, it properly treated the generating plant as real estate.

The second major area of disagreement concerns the proper method of valuing the plant. The board gave equal weight to the net book cost and to the depreciated reproduction cost of the plant. Neither party agrees with the board's conclusion.

We, however, generally accept the board's judgment on this issue, subject to the possibility of a relatively minor adjustment to reflect the *replacement* rather than the *reproduction* cost of certain portions of the plant. As a third issue, Edison objects to the disproportion ratios the board used for the tax years 1977, 1978, and 1979 to reflect the fact that the assessors undervalued certain classes of real estate in Boston. See *Tregor* v. *Assessors of Boston*, 377 Mass. 602, cert. denied, 444 U.S. 841 (1979). We conclude that the board should consider this issue further, as well as the question of the proper valuation of the land. We reject the assessors' appeal and reject also other arguments Edison has advanced, some of which are unimportant in light of certain of our conclusions and others of which (mostly evidentiary matters) we have considered but deem it not necessary to discuss.

In the board's findings of fact and report the board carefully described the property at the site as consisting of five main buildings that house most of the generating equipment, which has a plant capacity of 760 megawatts. In each unit of the plant a steam-powered turbine generator provides power which is transmitted to transformers that convert the power to the proper voltage for transmission over the distribution system. The turbine generator in one unit weighs 1,400 tons; in another the turbine generator weighs 922 tons. Each is mounted on a massive concrete pedestal, thirty-three feet high and sunk deep into the ground. Each turbine generator is powered by a steam generator or boiler that is 166 feet high. There are large condensers which circulate cold water from Boston Harbor. Edison owns most of the land at the site but some of it is used under licenses from the Commonwealth, which, the board found, the Commonwealth would be unlikely to revoke.

The board found the net book value of the property for each year using (1) a value for the land taken from the testimony of a witness for Edison,[1] and (2) a value of structures and plant taken from a summary presented by Edison. The board's con-

---

[1] In part 4 of this opinion we discuss the propriety of the board's use of that figure.

clusions are set forth in the margin.[2] The board further found the depreciated reproduction cost of the property using (1) the same land value and (2) with certain modifications, the depreciated reproduction cost of the generating plant offered by the assessors.[3] The board reached its determination of the fair cash value of the property by giving equal weight to the net book cost and the depreciated reproduction cost.[4] The board then applied disproportion ratios for the fiscal years 1977, 1978, and 1979. For the last three fiscal years involved in this proceeding (as to which neither party objects in this respect), the board followed G. L. c. 58A, § 14 (1986 ed.), which provides for abatement to the municipal average under a statutory formula. From its determination of the taxes due in each year, the board determined the abatements which are summarized at the beginning of this opinion.

[2]

| Fiscal year | Fair market value land | Structures | Plant | Total |
|---|---|---|---|---|
| 1977 | 2,370,737 | 8,965,359 | 55,167,490 | 66,503,586 |
| 1978 | 2,476,103 | 8,695,385 | 53,090,980 | 64,262,468 |
| 1979 | 2,379,519 | 13,075,354 | 55,538,091 | 70,992,964 |
| 1980 | 3,002,934 | 13,557,682 | 54,447,747 | 71,008,363 |
| 1981 | 3,266,349 | 13,870,874 | 53,836,620 | 70,973,843 |
| 1982 | 3,529,764 | 15,972,761 | 55,048,521 | 74,551,046 |

[3]

| Fiscal year | Unadjusted repro. cost | Depr. factor | Depreciated repro. cost | Land | Total |
|---|---|---|---|---|---|
| 1977 | 221,419,357 | 0.715 | 158,314,840 | 2,370,737 | 160,685,577 |
| 1978 | 237,699,148 | 0.695 | 165,200,908 | 2,476,103 | 167,677,011 |
| 1979 | 264,437,448 | 0.677 | 179,024,152 | 2,379,519 | 181,403,671 |
| 1980 | 286,079,892 | 0.658 | 188,240,569 | 3,002,934 | 191,243,503 |
| 1981 | 312,073,255 | 0.630 | 196,606,151 | 3,266,349 | 199,872,500 |
| 1982 | 346,461,762 | 0.611 | 211,688,137 | 3,529,764 | 215,217,901 |

[4]

Fair Cash Value, Computed by Giving Equal Weight to Net Book Cost and Depreciated Reproduction Cost

| Fiscal year | Net book cost | Depreciated reproduction cost | Fair cash value |
|---|---|---|---|
| 1977 | 66,503,586 | 160,685,577 | 113,594,582 |
| 1978 | 64,262,468 | 167,677,011 | 115,969,739 |
| 1979 | 70,992,964 | 181,403,671 | 126,198,318 |
| 1980 | 71,008,363 | 191,243,503 | 131,125,933 |
| 1981 | 70,973,843 | 199,872,500 | 135,423,171 |
| 1982 | 74,551,046 | 215,217,901 | 144,884,473 |

1. We consider first the question whether the board properly treated the generating plant as real estate. Each party argues that we need not reach the underlying question whether such a generating plant may be taxed as real estate because, each says, particular circumstances require a decision in its favor regardless of the proper answer to the underlying issue. We reject all these arguments, discuss only two of them in any detail, and then consider the basic question.

Citing G. L. c. 59, § 59, as amended by St. 1978, c. 580, § 33, the assessors argue that Edison's applications for abatement and its petitions to the board failed to raise any claim that the assessors had misclassified the generating plant as real estate.[5] The assessors did not advance this objection until their post-hearing reply brief to the board, and then did so only indirectly in the context of confronting Edison's claim that the assessors were estopped to argue that the generating plant was real estate. The claimed defect in the application for abatement presents no substantive issue of merit. See *Children's Hosp. Medical Center* v. *Assessors of Boston*, 393 Mass. 266, 268-269 (1984).

As to Edison's petitions to the board, it is obvious that the board had to separate Edison's real estate from its personal property in order to decide the real estate valuation questions. The board believed the issue whether the entire generating plant was taxable as real estate was before it. Without deciding whether the board properly could have ruled the subject not raised by Edison's petitions, we conclude that at the hearing the assessors were neither unfairly surprised nor thought themselves prejudiced by Edison's argument and that, in its discretion, the board properly could and did consider the issue (see G. L. c. 58A, § 7).

Edison points out that, without objection from the assessors, it included the generating plant on lists of personal property it filed annually with the assessors pursuant to G. L. c. 59, § 29

---

[5] The 1978 amendment added "an improper classification" as a basis for seeking an abatement from assessors. The amendment addressed an entirely different classification process: the classification of real estate into various categories for local tax purposes. See G.L. c. 59, § 2A (b).

(1986 ed.). Edison argues that the assessors may not now challenge the status of the plant as personal property because, when assessors do not seasonably object, they must receive such a list as true, except as to value. See G. L. c. 59, § 35 (1986 ed.). These circumstances do not make binding a taxpayer's characterization of property as personal property. We have held that assessors may not assess personal property a taxpayer erroneously included in his annual list. *Charlestown* v. *County Comm'rs of Middlesex*, 109 Mass. 270, 272 (1872). If a property owner is not bound or estopped by his erroneous inclusion of personal property on the annual list, there is no reason why the assessors should be bound by a taxpayer's inclusion of real property on such a list.[6]

We agree with the board that the assessors properly treated Edison's generating plant as real estate for the purposes of local taxation. It would seem unnecessary to decide such a question in most instances because an electric utility's real and personal property are taxable locally at the same rate. Here, however, because the assessors and Edison settled Edison's personal property tax appeals for the same years that are involved in the real estate tax appeals before us, the question becomes important.[7]

---

[6] We mention other arguments briefly. Each party asserts that the other is estopped to argue (or has waived) its position concerning the status of the property as realty or personalty. We have considered the various arguments and reject them. Discussion of these fact-dependent points would not be generally instructive.

The assessors are not aided by G. L. c. 59, § 82 (1986 ed.). That section concerns not overvaluation but rather erroneous or illegal assessments of taxes. See *Sears, Roebuck & Co.* v. *Somerville*, 363 Mass. 756, 757-758 (1973). Personalty and realty are treated separately for local tax purposes and generally may not be combined for determining valuation questions. See *Chelsea* v. *Richard T. Green Co.*, 319 Mass. 162, 163 (1946); *Hamilton Mfg. Co.* v. *Lowell*, 185 Mass. 114, 118 (1904). See, however, G. L. c. 58A, § 12D (1986 ed.), inserted by St. 1985, c. 532, and not involved in this proceeding, concerning procedures for dealing with disagreements in proceedings before the board over the treatment of the property of electric and gas companies as real or personal property.

[7] The settlement was made in a result-oriented manner, settling on the maximum Edison would have to pay the city in certain tax years. As far as appears, the parties never discussed and certainly never agreed on the

The board found Edison's electrical "manufacturing machinery to be physically and functionally incorporated into the real estate on which it is situated." The board relied on the statutory definitions of real estate for the purpose of taxation[8] and on tax and other cases which determined whether a particular item of property was real or personal property. Edison does not challenge the board's factual finding that Edison's generating plant is part of the real estate in the sense that it is a fixture and thus real estate under traditional principles.

Rather Edison argues that, as a matter of law, its generating plant, even if affixed to the real estate, is machinery used in manufacture and must be taxed as personal property. Its claim is that by statute and case law all machinery used in manufacture is personal property for tax purposes and that, if owned by an electric utility company, that machinery is taxable locally (G. L. c. 59, § 5, Sixteenth [1] [1986 ed.]), only as personal property.[9] It is Edison's position that clause Sixteenth (1) of

items of personal property as to which the settlement was being made. Edison now argues that (1) the assessors had to treat the generating plant as personal property, (2) Edison always thought of the plant as personal property, and (3) the plant would be double-taxed if we now allowed it to be considered in the valuation of Edison's real estate. The assessors, on the other hand, argue that, unless the plant is treated as real estate for the tax years involved, Edison escapes taxation entirely on its generating plant because the assessors did not include it in valuing Edison's personal property.

[8] These definitions present specific definitions of real estate for tax purposes. There were three definitions of "real estate for the purpose of taxation" successively applicable to the tax years (1977-1982) involved here. For fiscal years 1977, 1978, and 1979, the definition (G. L. c. 59, § 3, as appearing in St. 1913, c. 636, and repealed by St. 1978, c. 580, § 16) included "all land within the commonwealth and all buildings and other things erected thereon or affixed thereto." For fiscal year 1980, the definition (G. L. c. 59A, § 2, inserted by St. 1978, c. 580, § 38, and repealed by St. 1980, c. 261, § 16) provided that real estate included "all land and all buildings and improvements thereon or affixed thereto." For fiscal years after 1980, G. L. c. 59, § 2A (1986 ed.) (inserted by St. 1979, c. 797, § 11), refers to land "and all buildings and other things thereon or affixed thereto." No party finds significance in the difference in the language.

[9] General Laws c. 59, § 5, Sixteenth (1), exempts Edison's property from local taxation "other than the following: — real estate, poles, underground conduits, wires and pipes, and machinery used in manufacture."

G. L. c. 59, § 5, recognizes three categories of property to be taxed locally (real estate; poles, underground conduits, etc.; and machinery used in manufacture) and that machinery used in manufacture is never to be treated as real estate and must, therefore, be personal property for tax purposes.

The board took the position that "the manufacturing machinery of a nonmanufacturing corporation which is physically and functionally incorporated into the real estate so as to become a part of it is properly assessable as real estate . . . and is not assessable as personal property." In the board's view, only a utility's machinery used in manufacture that is not real estate (and certain poles, underground conduits, wires and pipes) may be taxed as personal property.

The board's conclusion makes sense as a general matter because machinery that is a part of the real estate normally will be sold with the real estate and most easily can be valued as part of it. Moreover, there is something obviously anomalous about a personal property tax bill that reflects assessments on machinery used in manufacture that is in fact real property. One logically would expect assessments on such property to be reflected in real estate tax bills. There is, however, no reason why certain property could not be both real estate and machinery used in manufacture. The generating plant appears to be both and thus arguably is subject to local taxation as either.

There are, therefore, two ways in which we could affirm the board's decision that the generating plant was properly treated as real estate. One would be to rule, as the board did, that the assessors were obliged to treat the generating plant as real estate and that for the assessors to have done otherwise would have been an error of law. This approach, at least in theory, is indifferent to what the assessors in fact did in assessing the generating plant. The other approach would be to conclude that the assessors had discretion to tax the plant either in the personal property category (because it was machinery used in manufacture) or as real estate and to uphold the treatment of the plant as real estate in this case, if they assessed it as real estate. This second approach avoids the possible unfairness of the first one because it requires consideration of

what the assessors in fact did with the generating plant and bars the assessors from now arguing that the plant is real estate whose value can help support their real estate valuations, if in fact they treated the plant as personal property.

The board, apparently concerned with the fairness question, reopened the hearing to determine how the assessors had treated the generating plant and concluded that the assessors had assessed the plant as real estate. On the record we cannot fairly declare this finding unsupported. There is no doubt on the record that, as the generating plant was built, Edison's real estate assessments, but not its personal property assessments, increased accordingly and that thereafter the assessors made no change in the assessments signaling a change of position. Therefore, the board's decision can be supported on the theory that the assessors had a choice as to the taxable category in which to place the generating plant, and they properly could and did assess it as real estate.[10]

In arguing that machinery used in manufacture, even if it is real estate for certain purposes, must be assessed and taxed as personal property, Edison relies on certain statutes and on language in various opinions of this court. The statutes do not help Edison, and none of the cases involved the issue before us. Edison presents no persuasive reason why machinery used in manufacture that is part of the real estate must be assessed as personal property.

Edison argues that, because our opinions have referred to "poles, underground conduits, wires and pipes" (§ 5 Sixteenth [1]) as personal property, "machinery used in manufacture" which is referred to in the same subclause, must not be real estate either. In *Boston Gas Co.* v. *Assessors of Boston*, 334 Mass. 549, 552-553, 562, 565 (1956), we held that certain portions of gas and electric distribution systems were taxable pursuant to G. L. c. 59, § 5, Sixteenth, as machinery used in

---

[10] It is preferable to treat such property as real estate for reasons already given. Moreover, if property is real estate and is assessed as real estate, the municipality may automatically obtain a tax lien on the property. G. L. c. 60, § 37 (1986 ed.). *Chelsea* v. *Richard T. Green Co.*, 319 Mass. 162, 163 (1946). See *Boston* v. *Rockland Trust Co.*, 391 Mass. 48, 57 (1984).

manufacture and at various points referred to that property as personal property. We have recently said in two opinions that underground conduits, transformers, pipes, and wires had been taxed as personal property, although no issue presented in either case turned on the point. See *Montaup Elec. Co.* v. *Assessors of Whitman*, 390 Mass. 847, 848 (1984); *Boston Edison Co.* v. *Assessors of Watertown*, 387 Mass. 298, 299-300 (1982). See also *Assessors of Quincy* v. *Boston Consol. Gas Co.*, 309 Mass. 60, 61 (1941) (street mains, service connections and customers' meters described as personal property); *Northern Mass. St. Ry.* v. *Westminster*, 227 Mass. 547, 551 (1917) (poles and wires of a street railway on private land of another or on public ways are personal property for purposes of taxation). No doubt some items within the scope of "poles, underground conduits, wires and pipes" would be real estate in the traditional sense if on a utility's own land. The status of that class of property, however, on, above, or under the land of others, including public ways, has a more tenuous quality than a generating plant on one's own land. A utility generally has an obligation, on appropriate demand, to remove or relocate its distribution facilities in public ways and on private land of others. A tradition has developed of treating all such property as personal property for local tax purposes. That custom does not instruct us that fixtures on a utility's own land must be treated for local tax purposes as personal property merely because they are also machinery used in manufacture.

Edison properly points out that by virtue of G. L. c. 59, § 5, Sixteenth (3) (1986 ed.), a domestic manufacturing corporation is not subject to local taxation on its machinery. It then notes that this court has held that exemption applicable to machinery that is part of the real estate under traditional principles. We did so because, for the purposes of that statute, the property's dominant aspect is that of machinery rather than real estate. See *Assessors of Swampscott* v. *Lynn Sand & Stone Co.*, 360 Mass. 595, 598-599 (1971). This holding, however, applies only to manufacturing corporations and arises from the explicit legislative purpose to free the machinery of manufac-

turing corporations from the burden of local taxation. See *Commissioner of Corps. & Taxation* v. *Assessors of Boston*, 321 Mass. 90, 95-96 (1947). The *Lynn Sand & Stone* case did not say that the machinery in dispute was personal property. It simply said that it was not subject to local taxation. In the case before us, there is no legislative policy to incline us toward treating a public utility's machinery that is part of the real estate as personal property to the exclusion of treating it as real estate.

We fully grant that there is language in at least two opinions of this court that can be read to support Edison's general proposition that machinery used in manufacture is only taxable as personal property. In *Hamilton Mfg. Co.* v. *Lowell*, 185 Mass. 114, 117 (1904), we said in dicta that machinery subject to local taxation "is not taxed as real estate, but as personal property." In that case, there was no suggestion that the taxpayer's machinery was part of the real estate. Taxable machinery not part of the real estate could be taxable, if at all, only as personal property. The same general point was reiterated in dicta in *Chelsea* v. *Richard T. Green Co.*, 319 Mass. 162, 166 (1946), to the effect that machinery used in manufacture "is to be assessed as an item of personal property." That case did not involve such machinery. In fact, it involved machinery that was properly assessed as real estate. These two cases carry no controlling or persuasive force on the issue before us.

Because the assessors could lawfully treat the generating plant as real estate and did so, we affirm the board's determination that the plant should be treated as real estate for the purposes of this proceeding. We need not decide whether we agree with the board that it would have been improper for the assessors to have assessed the generating plant as personal property.

2. Both Edison and the assessors object to the board's decision to arrive at the fair cash value of the real estate (excluding the land) by giving equal weight to its net book cost and its depreciated reproduction cost. The assessors argue that net book cost has no relevance on the record and that the board should not have considered net book cost in its determinations.

Edison takes a position almost at the opposite pole, arguing that net book value, or something not much above it, sets the fair market value of the real estate. We uphold the board's general determination to arrive at the fair cash value of the real estate (not including the land) by giving equal weight to net book cost and depreciated reproduction cost.

The parties' mutual but polarized disenchantment with the board's averaging approach arises from their view of principles this court considered in *Montaup Elec. Co.* v. *Assessors of Whitman*, 390 Mass. 847 (1984), and *Boston Edison Co.* v. *Assessors of Watertown*, 387 Mass. 298 (1982). In the *Watertown* case, we noted the position of the Department of Public Utilities (department) that a utility purchasing an asset from another utility would be allowed a return on the transferred property based on that property's net book, or rate base, value in the hands of the seller. *Id.* at 301. We remanded that case to the board to reconsider why a willing buyer would not be influenced by the rate base value and why anyone reasonably would pay a much higher price for the property. *Id.* at 304-305.[11] In the *Montaup Elec. Co.* case, *supra* at 856, we reversed the board's decision because it again relied almost entirely on the depreciated replacement or reproduction cost of the property without explaining why net book cost should be substantially disregarded.

This case falls into a different category. The board gave extensive attention to the question whether a price substantially above the net book cost of the property might have been paid. The board decided that the potential market for the generating plant extended to public sector utilities whose rates are not regulated, or at least not as intensively regulated as investor-owned utility rates. It considered the presence in the market of the Massachusetts Municipal Wholesale Electric Company

---

[11] In determining the fair cash value of the property the board without explanation had given 95% weight to depreciated reproduction cost and only 5% weight to net book cost. In our decision on appeal after remand, we upheld, as within its discretion, the board's decision to give 97% weight to net book cost and 3% weight to depreciated reproduction cost. See *Boston Edison Co.* v. *Assessors of Watertown*, 393 Mass. 511 (1984).

(MMWEC), a corporation with authority to buy generating capacity anywhere in New England for municipal systems. See G. L. c. 164A, § 3. Such an entity has certain tax advantages and thus could pay substantially more for generating capacity than a public utility without increasing its rates.

The parties disagree sharply over the extent to which the board properly could regard MMWEC and other publicly owned utilities as active participants in the market for electric generating facilities during the years in question and as potential purchasers of the property. Both sides presented substantial and conflicting opinion testimony on the question whether any publicly owned utility might actually have purchased the plant if it had been for sale. It certainly was not necessary that a buyer actually desiring to purchase the property be identified for each tax year. The board was justified in determining that the fair cash value of the property would be increased by a probability, or even a possibility, that a buyer willing and able to pay a price above net book cost might be found, currently or in the relatively near future.

On the other hand, the potential was limited that a purchaser would be found that would reasonably pay significantly more than the net book cost of the property. The board justifiably discounted the depreciated reproduction cost to reflect this fact. Although we view the board's assessment of the likelihood that an unregulated buyer might be available to be on the optimistic side, we defer to the board's judgment on where to draw the line.[12] We particularly reject, however, the assessors' argument that, once there is evidence of the possibility of a

[12] The board did not discuss all Edison's evidence pointing to a negative answer to the question whether a buyer able and willing to pay substantially above net book cost would be available. A municipal light plant and other publicly owned entities in Massachusetts are not entirely free from regulatory control (see G. L. c. 164, §§ 57, 58 [1986 ed.]), and such an entity might not have been able to finance bonds to acquire property at a price as high as its depreciated replacement cost (see G. L. c. 164A, §§ 1-17). The question of the regulation of such entities was one for the board to weigh, and, although acknowledgment of the problem in the board's opinion would have been preferable, we see no need to remand the proceeding for findings and conclusions on this point.

sale above net book value, the "presumption" that net book value has relevance disappears. The likely influence on the market of the department's rate making rules cannot disappear. The department's views are of continuing importance.

The board further noted that purchasing the Edison property could have a number of advantages over constructing new generating capacity. In addition, the board not unreasonably saw in the decision of the Department of Public Utilities that we upheld in *Attorney Gen.* v. *Department of Pub. Utils.*, 390 Mass. 208 (1983), the possibility that the department might allow adjustments in a purchaser's rate base to reflect a prudent purchase price above the plant's net book cost.

The difference between the transmission and distribution property involved in the *Watertown* case and the entire generating facility in this case supports the board's determination that the department might view (indeed, we say, might have to view) the rate base issue differently. The purchase of an existing generating plant at a price well above its net book cost might be a reasonable one in relation to the cost of construction of a new plant (and further might be reasonable based on other practical considerations). The principle underlying the department's rule that ratepayers should not have to pay for a facility more than once would carry much less weight in this situation.[13]

We are dealing in a specialized area in which fair market value normally cannot be determined with meaningful assistance from comparable sales or by the capitalization of income. Utilities may well have a valid complaint that for rate purposes one agency (the department) values their property at net book cost in a time of generally rising costs, while, for local tax purposes, the board places a substantially higher value on their property. The two processes are different, however, and the fact that there is a difference in valuation is not unlawful.

---

[13] We are surprised at the board's comment that this court has an "apparent commitment to the carry-over rate-base limitation." We have no such commitment. The Department of Public Utilities may have one. It is not our function to dictate agency choices made within lawful limits, accompanied by record support and reasoned explanation.

We comment on one further point. Edison complains that the board was not warranted in deciding "that if [Edison] were willing to sell its South Boston plant, the probability is at least 50% that the buyer or buyers would be publicly-owned utilities willing to pay up to depreciated reproduction cost," and that the board's conclusion that it "therefore adopted an equal weighting of the two sets of figures" was unsupported. This may be a rare example of an agency that attempted too much precision in describing the reasons for its result. The board found a number of forces whose influence would have had an effect on the price at which the generating plant might have been sold. The board had to express the combined effect of these factors in numerical terms in valuing the plant, but their influence cannot be quantified in a way which will support a result with mathematical precision.

3. We turn next to certain challenges to the board's determination of the depreciated reproduction cost of the property.

Edison is correct that the board erred in its treatment of the question whether the facility would be reproduced. There was evidence from witnesses on both sides that certain portions of the plant would not be reproduced but rather more prudently would be replaced by other forms of equipment. This suggests that depreciated replacement cost might be the better measure of value than reproduction cost for certain portions of the facility. See *Boston Edison Co.* v. *Assessors of Watertown*, 387 Mass. 298, 300 n.3 (1982); *Correia* v. *New Bedford Redevelopment Auth.*, 375 Mass. 360, 364 (1978). The board recognized testimony that some of the plant would not be reproduced. It appears to have concluded erroneously that Edison submitted estimates of replacement cost only for cranes and hoists. In fact, Edison submitted evidence of depreciated replacement costs of all equipment including cranes and hoists, and the board itself presented in its findings (and then never discussed) evidence from Edison showing the "Replacement Cost of Buildings, Improvements, Foundations, Cranes and Hoists."[14] The assessors' argument may be correct that the dif-

---

[14] In fact, the board's exhibit is incorrectly titled. The figures come from an Edison exhibit showing replacement costs (including land) but "not including cranes and hoists."

ferences between depreciated replacement costs and depreciated reproduction costs are insignificant in this case. Edison is entitled, however, to have the board consider the evidence and decide whether portions of the plant would be replaced rather than reproduced and, if the difference is significant, use replacement rather than reproduction costs in its calculations.

The assessors argue, on the other hand, that the board erred in not finding the fair cash value of the property to exceed its depreciated reproduction cost. The assessors' principal contention is that the board failed to give sufficient weight to their evidence of comparable sales, income capitalization, and unit cost per kilowatt hour methods of valuation. The board noted the difficulty of applying these methods of valuation in this proceeding and was acting within its discretion in using these methods only to check the results of Edison's estimate based on the depreciated reproduction costs of the property.

4. Edison correctly points to inadequacies in the board's treatment of the value of the land. Approximately 25% of the land on the site is owned by the Commonwealth and occupied by Edison under revocable licenses. Edison argues that, pursuant to G. L. c. 59, § 2B, inserted by St. 1979, c. 797, § 11 (effective for fiscal years commencing on or after July 1, 1980 [St. 1979, c. 797, § 25]), the licensed portion of the land is not assessable to it.[15] Section 2B allows the local taxation of property owned by the Commonwealth, if, as here, it is used in connection with a business conducted for profit and is occupied for other than a public purpose. The board so ruled, but it gave no attention to language in the last paragraph of § 2B providing that § 2B shall not apply to "easements, grants, licenses or rights of way of public utility companies." The assessors argue that the statute should not be read literally but only as excluding from local taxation easements and licenses of utilities in public ways. On remand, the board should consider this issue, and, if it concludes that § 2B should be read

---

[15] For fiscal years commencing prior to July 1, 1980, see G. L. c. 59, § 3A, as amended through St. 1977, c. 911, § 1, where the significant language is the same.

to apply to all licenses and not just to licenses in public ways, the board should adjust its land valuation accordingly.

The board's determination of the value of the land also is not explained in its decision. The board selected the opinion of Edison's expert as to the value of the land if vacant and used that value in its determination of net book cost and depreciated replacement cost. Edison's expert also represented, however, that, because of the cost of clearing and demolition, the land with the structures on it had a negative value. He testified that for assessment purposes he would use the land's net book cost. The board on remand should explain its reasons for selecting the land value it did, or, in its discretion, select another land value and explain it.

5. Edison challenges the disproportion ratios the board used for fiscal years 1977, 1978, and 1979 as improper.[16] The board used the ratios the Department of Revenue determined for Boston pursuant to G. L. c. 58, §§ 10-10C (1986 ed.). The ratios established by the Department of Revenue are entitled to prima facie weight, but a taxpayer is in no way barred from challenging them in an abatement proceeding. G. L. c. 58A, § 12C (1986 ed.). If a taxpayer presents credible evidence showing lower ratios are appropriate, the Department of Revenue ratios simply are evidence in the proceeding. See *Cook* v. *Farm Serv. Stores, Inc.*, 301 Mass. 564, 566 (1938). While weight may properly be given to a study prepared by an experienced governmental agency (see *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 475-576 [1981]), contrary evidence, more detailed and more focused, cannot be ignored where the statute does not make the Department of Revenue ratios conclusive.

The board did not weigh the evidence in the usual manner but rather found that Edison had "not sustained its burden of showing that the [Department of Revenue] ratios were so inac-

---

[16] A disproportion ratio is designed to adjust for the unequal valuation of various classes of real estate during the fiscal years involved here. There are some who would say the selected ratios overcompensated for that unequal treatment. See *Tregor* v. *Assessors of Boston*, 377 Mass. 602, 613 (1979) (Wilkins, J., dissenting with whom Hennessey, C.J., joins).

curate, if at all, as to justify overturning the standard of equality already firmly established for the property of the city's tax-payers during the fiscal year in question." In its opinion the board says that Edison's evidence failed to show that its own figures are entitled to be substituted for those adopted by the State under the statutory procedure.

We are uncertain as to what test the board applied to Edison's evidence. Under G. L. c. 58A, § 12C, a taxpayer may rely on the Department of Revenue's ratios, but we see nothing that permits those ratios to be used against a taxpayer if the taxpayer presents substantial evidence showing ratios more favorable to the taxpayer. We have doubt whether the board is correct on this record when it says that Edison failed to establish that its ratios were more reliable than the Department of Revenue's ratios. If the board is correct, it has not adequately explained why. See *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 470 (1981).[17]

We are more attracted to the assessors' suggestion that the use of the department's ratios has established a "standard of equality" for Boston taxpayers who have sought abatements from the board. If the board has consistently used the Department of Revenue ratios for the fiscal years in question, there may be support for application of a general rule which treats all equally, even in the face of a demonstration that the Department of Revenue ratios are somewhat too high.[18] Edison points in its brief, however, to abatement proceedings in which, it says, that board used lower ratios. In the absence of uniform treatment, the concept of a "standard of equality" can have no validity.

---

[17] The Edison study included more data but was not "stratified" by ward to avoid possible improper weighting of the data. Edison's position was that, if stratified, the ratios of Edison's study would have been even lower. The board may have accepted that conclusion in its findings but does not acknowledge it in its opinion.

[18]

| Fiscal year | Department ratios | Edison ratios |
|---|---|---|
| 1977 | 26.8% | 22.9% |
| 1978 | 22.4% | 21.6% |
| 1979 | 22.4% | 19.9% |

The board should reconsider its findings and rulings on the disproportion ratios to be used. It should give no special weight to the Department of Revenue ratios, as against the taxpayer's evidence on the same subject, in the absence of a showing of uniform treatment of Boston taxpayers seeking abatements on the ground of disproportionate assessments.

6. We have upheld the board's decision in major respects. We remand the proceedings to the board to consider the following subjects which we have indicated need further attention: (1) the question of the use of replacement rather than reproduction costs as to certain aspects of the generating plant, (2) reconsideration of the value of the land, and (3) reconsideration of the disproportion ratios to be used for the fiscal years 1977, 1978, and 1979.

*So ordered.*