STOW MUNICIPAL ELECTRIC DEPARTMENT *vs.* DEPARTMENT
OF PUBLIC UTILITIES.
HUDSON LIGHT AND POWER DEPARTMENT *vs.* DEPARTMENT OF
PUBLIC UTILITIES.
MASSACHUSETTS MUNICIPAL WHOLESALE ELECTRIC
COMPANY *vs.* DEPARTMENT OF PUBLIC UTILITIES.

Suffolk. September 9, 1997. - December 30, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Public Utilities,* Electric company, Judicial review, Stranded costs. *Real
Property,* Sale. *Value. Statute,* Construction. *Evidence,* Value, Reproduction
cost.

Statement of the standard of review of an appeal from a decision pursuant to
   G. L. c. 25, § 5, of the Department of Public Utilities. [344]
The Department of Public Utilities acted within its discretion in valuing
   certain municipal utility company property pursuant to G. L. c. 164, § 43,
   by a weighted combination of original cost less depreciation and reproduc-
   tion cost new less depreciation [344-346]; further, the department acted
   within its discretion in using a straightline method to calculate depreciation
   from original cost and a composite depreciation method to calculate
   depreciation from reproduction cost new, to which neither party had
   objected [346-347]; finally, the department did not engage in impermissible
   speculation by discussing in its decision the potential for regulatory change,
   where that formed no basis for the department's order [347]: the decision
   of the department was supported by substantial evidence and was not
   arbitrary or capricious.
The Department of Public Utilities correctly determined that a municipal util-
   ity company did not demonstrate "direct and certain" damages to certain
   physical equipment as a result of the withdrawal of a town from its
   customer base. [347-348]
A decision of the Department of Public Utilities denying a municipal utility
   company recovery of stranded costs arising from the withdrawal of a town
   from the company's customer base was remanded for reconsideration in
   light of the public interest, where the department's analysis failed to apply
   the department's stated stranded cost principles, failed to recognize the
   existence of certain stranded costs, failed to allocate properly the burden of
   proof with respect to mitigation and required the company to make mitiga-
   tion efforts that were futile. [348-353]

CIVIL ACTIONS commenced in the Supreme Judicial Court for

the county of Suffolk, two on March 7, 1996, and one on April 12, 1996, respectively.

The cases were reported by *O'Connor, J.*

*Michael B. Meyer* for Stow Municipal Electric Department.

*Paul K. Connolly, Jr.*, for Hudson Light and Power Department.

*Nicholas J. Scobbo, Jr.*, for Massachusetts Municipal Wholesale Electric Company.

*Pierce O. Cray*, Assistant Attorney General, for the Department of Public Utilities.

ABRAMS, J. Hudson Light and Power Department (Hudson), the town of Stow (Stow), and Massachusetts Municipal Wholesale Electric Company (MMWEC)[1] appeal from Department of Public Utilities (department) order No. 94-176. Stow and Hudson each appeal from the department's valuation of Hudson's property within Stow. Hudson also appeals from the department's determination that it was not entitled to consequential damages and stranded costs. The parties appealed the department's decision to a single justice of this court. See G. L. c. 25, § 5. The single justice reserved and reported the cases to the full court. We affirm the department's decision as to the valuation of Hudson's property in Stow and consequential damages. We reverse the department's decision denying Hudson stranded costs.

1. *Facts and procedural history.* Pursuant to St. 1898, c. 143, Hudson has supplied Stow, as well as several other towns, with all its electricity for nearly one hundred years. To meet its obligations to Stow and other customers, Hudson participates in power sales agreements (PSAs) with MMWEC and other suppliers. Under these agreements, Hudson agreed to buy power at prices considerably higher than today's market rates, which have decreased due to restructuring and increased competition in the electric industry. In *Massachusetts Mun. Wholesale Elec. Co.* v. *Danvers*, 411 Mass. 39 (1991), we stated that one of these PSAs, and step-up provisions included therein, remained enforceable against participants such as Hudson even though the Vermont Supreme Court had declared it void ab initio with respect to other participants. See *Vermont Dep't of Pub. Serv.* v.

---

[1]Massachusetts Municipal Wholesale Electric Company's arguments essentially track Hudson's. We therefore refer to these two appellants collectively as Hudson.

*Massachusetts Mun. Wholesale Elec. Co.*, 151 Vt. 73 (1988), cert. denied, 493 U.S. 872 (1989).

In 1993 and 1994, Stow voted at two town meetings, as authorized by G. L. c. 164, § 42, to "municipalize" the town's electricity distribution system, create the Stow Municipal Electric Department, and purchase Hudson's property located within the town "at a price to be agreed on." Stow and Hudson negotiated for 150 days, but did not reach an agreement.

On November 22, 1994, Stow petitioned the department pursuant to G. L. c. 164, § 43,[2] for a determination of a purchase price and damages, if any. Stow and Hudson agreed that the proper measure of the purchase price was cost less depreciation, rather than comparable sales or capitalized earnings. They disagreed, however, about how to calculate the agreed-to formula. Stow argued that the proper measure was original cost less depreciation, which it calculated to be $254,613. It arrived at this figure based on the total book cost of Hudson's property less straightline depreciation, multiplied by an allocation factor representing the ratio of Stow's electricity use to Hudson's total load.

Hudson argued that the proper measure was reproduction cost new less depreciation, which it calculated to be $4,896,030. This figure was based on the current cost of materials and labor for each component of its property in Stow, less a three-part depreciation factor: 25% for estimated service life; 25% for "life extension," based on Hudson's claim that the equipment has a longer-than-average life due to its maintenance program; and 50% for observed condition. Also, Hudson presented its own original cost less depreciation figure of $2,124,059, based on reproduction cost new less depreciation, scaled back for inflation. The department, reasoning that the statute's language required it to use original cost as a starting point but also permitted it to consider "any other element which may enter into a determination of a fair value," determined that the purchase price would be 50% original cost less depreciation plus 50% reproduction cost new less depreciation. Stow and Hudson each challenge the department's valuation.

Hudson argued that it was entitled to recover consequential damages resulting from the severance of Stow from its system. Because Stow's departure would result in decreased utilization

---

[2]The full text of G. L. c. 164, § 43, is set forth in the Appendix.

of certain equipment, Hudson claimed that it should be compensated for "underutilization." The department rejected this claim because Hudson had not shown "direct and certain" damages.

Hudson also argued that Stow should reimburse it for its "stranded costs," that is, the money it had already spent or was committed to spend under the PSAs and, it claimed, it could not recover without Stow as a customer. The department reasoned that, although the PSAs and rights under them may constitute "property" within the meaning of § 43, it would not be in the public interest to include them in the valuation of Hudson's property in Stow. It also declined to award stranded costs to Hudson because, in its view, Hudson had not established either that such costs existed or were unrecoverable, or that it had taken and will take all reasonable steps to mitigate stranded costs.

2. *Standard of review.* "Our review of petitions under G. L. c. 25, § 5, is limited, although not perfunctory." *Wolf* v. *Department of Pub. Utils.*, 407 Mass. 363, 367 (1990). We uphold the department's decision unless it is shown that it is based on an error of law, unsupported by substantial evidence, arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 867-868 (1997) (*MIT*), citing G. L. c. 30, § 14 (7). "General Laws c. 25, § 5, allocates to [the plaintiffs] the burden of proving such error. This burden is a heavy one. We give great deference to the department's expertise and experience in areas where the Legislature has delegated to it decision making authority." *Wolf, supra* at 367, · quoting *Costello* v. *Department of Pub. Utils.*, 391 Mass. 527, 533 (1984).

Our review of the department's decision, however, is impossible unless the decision is "accompanied by a statement of reasons . . . including determination of each issue of fact or law necessary to the decision." *MIT, supra* at 868, citing *Costello, supra* at 533. The department must make adequate subsidiary findings to support its determination of each issue of fact or law. See *MIT, supra* at 868. Because of the novelty and importance of the issues associated with industry restructuring, the need for an adequate statement of reasons is even more pressing. See *id.*

3. *Valuation.* Both Stow and Hudson take issue with the 50-50

valuation, arguing diametrically opposed positions. Stow argues that the department committed an error of law by using a 50% weighting of reproduction cost new less depreciation rather than 100% original cost less depreciation, both because this court's rulings foreclose it and because use of reproduction cost new less depreciation violates the statutory prohibition of "enhancement on account of future earning capacity." Stow further argues that the combination of its depreciation method to calculate original cost less depreciation with Hudson's method to calculate reproduction cost new less depreciation was arbitrary and capricious. Finally, Stow argues that the department's calculations are based on speculation about future changes in the industry rather than substantial evidence. By contrast, Hudson argues that the department should have used only reproduction cost new less depreciation. Alternatively, Hudson argues that, if original cost less depreciation is to be used, the department should have used Hudson's calculation of original cost less depreciation.

General Laws c. 164, § 43, requires the department to determine "what price should be paid, having in view the cost of the property less a reasonable allowance for depreciation and obsolescence, and any other element which may enter into a determination of a fair value of the property so purchased." The department's goal under this statute is to set a purchase price that represents "a fair value." The indefinite article suggests that there may be a range of fair values from which the department may select in its discretion. The department interpreted the word "cost" to mean the actual original cost of the property. This interpretation is within the department's discretion. See *Southbridge* v. *Southbridge Water Supply Co.*, 371 Mass. 209, 216 (1976) ("actual cost" means original cost). Thus, the department properly used Stow's original cost less depreciation figure as a starting point, rather than using Hudson's original cost less depreciation figure, which is actually a scaled-back reproduction cost new less depreciation.

The department's 50% weighting of reproduction cost new less depreciation was well within its discretion. First, the statute permits the department to consider "any other element which may enter into a determination of a fair value" in addition to the original cost. Reproduction cost new less depreciation, the current cost (less depreciation) of the materials and labor to reproduce the system, is such an element. We have said that

reproduction cost is "probative of fair cash value" of utility property. *Montaup Elec. Co.* v. *Assessors of Whitman*, 390 Mass. 847, 850 (1984). See also *Boston Edison Co.* v. *Assessors of Watertown*, 387 Mass. 298, 304 (1982) (*Watertown I*).

Second, in other cases involving valuation of utility property, we approved valuations combining original cost less depreciation and reproduction cost new less depreciation. See *Boston Edison Co.* v. *Assessors of Boston*, 402 Mass. 1, 12-13 (1988); *Boston Edison Co.* v. *Assessors of Watertown*, 393 Mass. 511 (1984) (*Watertown II*). We are unpersuaded by Stow's attempts to distinguish the *Assessors of Boston* case. The generation plant in that case was not so different from the distribution plant in this case as to mandate a different valuation method. Also, although the statute before the Appellate Tax Board in *Assessors of Boston* did not prohibit the consideration of "future earning capacity or good will," we do not agree with Stow that § 43 therefore automatically requires an even lower valuation (or a greater weighting of original cost less depreciation).

Third, use of reproduction cost new less depreciation is not an "enhancement on account of future earning capacity or good will." Reproduction cost new less depreciation bears at best an attenuated relationship to future earning capacity: A rational buyer would be willing to pay a given amount for equipment only if he or she thought it had an earning capacity sufficient to recoup the investment. The statutory language was intended to prohibit considerations that do not apply to a regulated monopoly, which has limited rates of return (and therefore limited future earning capacity) and, until now at least, a largely captive class of customers.

Both parties challenge the department's depreciation calculation. Stow argues that, because the department used the straightline method to calculate the depreciation from original cost, to be consistent, it should have used the same method to calculate the depreciation from reproduction cost new. Stow does not argue that the department should have used Hudson's composite depreciation method to calculate the depreciation from original cost. The record indicates, however, that the department actually preferred the composite method, which reflects the actual condition of the property, to the straightline method. The department used the straightline method to calculate the depreciation from original cost because neither party argued that it should use the composite method. We cannot say the department erred

for declining to calculate depreciation as urged by neither party, or for supposing, based on the parties' apparent indifference, that the effect on value would be small. As to the department's rejection of Hudson's "life extension" component of depreciation, which Hudson challenges, we think the department was within its discretion. The evidence called to our attention as supporting the "life extension" component shows only that utilities' maintenance practices generally can extend the life of their property. It says nothing about Hudson's maintenance practices. The evidence was inadequate to show that Hudson's maintenance practices extended the equipment's useful life. Further, the department was warranted in determining that the "observed condition" component captures the actual useful life expectancy of the equipment.

Finally, Stow argues that the department impermissibly speculated by discussing possible regulatory change. The department was required under our cases to consider the potential for regulatory change. See *Montaup, supra* at 853 (noting the possibility that the department might change its carry-over rate base policy); *Watertown I, supra* at 306 (noting that regulatory change may make a buyer more willing to pay more than original cost less depreciation). The department specifically considered its carry-over rate base policy, which it has recently changed from a mandatory rule always limiting a buyer of utility property to the seller's rate base to a case-by-case determination. We certainly cannot fault the department for considering the effect of this change and concluding that because the carry-over rate base rule might not apply to Stow, Stow should pay more than original cost less depreciation. The department also considered more general changes in the industry, but it recognized the difficulty of predicting the effects of restructuring. Rather than speculating about these effects, the department drew no conclusions. Therefore, contrary to Stow's argument, speculation about regulatory change was not a basis for the department's order. In sum, we conclude that the 50-50 valuation set forth in the department's order was supported by substantial evidence and not arbitrary or capricious.

4. *Consequential damages.* The department did not award Hudson damages for reduced utilization of certain equipment that had been used to serve Stow. Hudson concedes that this equipment will suffer no physical damage as a result of Stow's leaving its system. The equipment remains useful in the service

of Hudson's remaining customers. The department was correct in its determination that Hudson had not shown damages to be "direct and certain."

5. *Stranded costs.* Stranded costs are prudently incurred fixed costs, recovery of which is jeopardized by the transition of the industry from cost-based regulation to competition. See *MIT*, *supra* at 858 n.4. Stranded costs can include existing contractual obligations for power purchases above current market rates. *Id.* Any company in any industry does, of course, seek to recover its fixed costs from its customers, and so have utility companies. Under monopoly regulation, the department approves rates based on the utilities' fixed costs. As the electric utility industry becomes competitive, the companies set the rates themselves. New utility companies can enter the market without the economic baggage carried by incumbents and consequently will have substantially lower fixed costs. Accordingly, the entrants can charge lower rates than incumbents. The incumbents could thus lose business to the entrants, not because the entrants provide better service or operate more efficiently, but because of the incumbents' fixed costs, which cannot be recovered when competition drives rates down.

Permitting utilities to recover their prudently incurred stranded costs promotes fair and effective competition in the electric industry. See, e.g., Baumol & Sidak, Transmission Pricing and Stranded Costs in the Electric Power Industry (1995); Tye & Graves, The Economics of Negative Barriers to Entry: How to Recover Stranded Costs and Achieve Competition on Equal Terms in the Electric Utility Industry, Retail Utility Deregulation 413 (Mass. Continuing L. Educ. 1996). It is the policy of the Federal Energy Regulatory Commission (FERC) to permit the recovery of stranded costs associated with the restructuring of the electricity transmission industry. See, e.g., 18 C.F.R. § 35.26 (1996); Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, FERC Order No. 888, 61 Fed. Reg. 21,540 (1996).

We note that the department itself has determined that permitting utilities to recover stranded costs during the transition period would honor existing commitments and therefore protect consumers' interest in uninterrupted, reliable service. See Electric Indus. Restructuring Plan: Model Rules & Legislative

Proposal, D.P.U. 96-100, at 264-268 (Dec. 30, 1996)[3]; Investigation by the Dep't of Pub. Utils. on its Own Motion into Elec. Indus. Restructuring, D.P.U. 95-30, at 35 (Aug. 16, 1995). The department also has determined that utilities should take appropriate steps to mitigate their stranded costs. See D.P.U. 96-100, *supra* at 269; D.P.U. 95-30, *supra* at 37. We recently have stated that an award of stranded costs "must ensure that utility companies be allowed to recover only verifiable, prudent, and reasonable stranded costs, and that these costs be recovered from the parties to whom they are attributable — mainly the departing customers — and not the utilities' remaining ratepayers," *MIT*, *supra* at 872, because "the function of the department is the protection of public interests and not the promotion of private interests." *Id.* at 872 n.38, quoting *Lowell Gas Light Co.* v. *Department of Pub. Utils.*, 319 Mass. 46, 52 (1946). To the extent that, one way or another, utilities pass their fixed costs on to ratepayers, the public interest requires that no group of customers bear an unfair share of these costs.

The department's order recites a number of principles associated with the recovery of stranded costs, for example, that such recovery promotes competition; that utilities must take measures to mitigate their stranded costs; that stranded cost recovery mechanisms should not assign to other customers the costs that are appropriately assigned to a customer with options; that municipal utilities should be treated the same as investor-owned utilities, except where substantial differences warrant different treatment; that all customers should have opportunities to benefit from competition; and that no class of customers should benefit at the expense of another. As to both the existence and mitigation of stranded costs, the department failed to apply these principles.

Before the department, Hudson argued that it ought to recover from Stow the difference between the costs to be incurred under the PSAs for a twenty-four year period and the market price, for which it used as a proxy a price secured by Stow in one power supply contract. The department approached this claim according to the principles for recovery of stranded costs set forth in D.P.U. 95-30, *supra*. We think that the department's analysis is flawed in certain respects.

[3]The department released D.P.U. 96-100 after issuing the order in this case. Therefore, the principles stated there do not apply to the cases before us.

The department treated Hudson's request to have Stow buy a "slice of system"[4] as a request to assign to Stow portions of the PSAs themselves. The record does not support the department's characterization. Hudson wanted the department to include a portion of the *power* in the sale of property to Stow. There is no evidence that this would require an assignment of the contracts. The department has never treated a slice of system as it did in this case. See *Fitchburg Gas & Elec. Light Co.*, D.P.U. 89-153 (1989). There was no basis for the department's assertion that Hudson wanted to assign Stow portions of the PSAs. On remand, the department should consider whether the public interest favors including in the property to be sold to Stow a portion of the power that Hudson purchases under the PSAs.

The department next considered whether its stranded cost principles support granting Hudson an award of damages for the above-market costs. As we read § 43, the department may award a utility stranded costs associated with a customer's departure when it is in the public interest to do so. However, the department's analysis fails to apply its principles in a manner consistent with its obligation to protect the interests of Hudson's ratepayers.

First, the department rejects both the twenty-four year time period and the market price proxy without adequate explanation. There is evidence in the record supporting the conclusion that Hudson's contract commitments will endure for twenty-four years — that is, that Hudson will have to pay the above-market PSA prices for twenty-four years. The only challenge on the record to the twenty-four-year period is Stow's argument that it is too short a period to accommodate prices that will continue to fall. As to the market price proxy, the department fails to explain why an arm's-length negotiation between a willing buyer and a willing seller would not approximate a fair market price. The department speculates as to what prices Hudson "could" secure and does not address the possibility of using a "true-up"[5] to account for actual market rates in the future. Moreover, the record establishes no opposition from Stow as to the market price proxy. There is no explanation for the

---

[4]A "slice of system" is an arrangement under which a utility sells a mix of resources from its entire portfolio, rather than all the output from only one facility.

[5]A "true-up" is a payment made to offset the difference between an earlier estimated payment and actual costs.

department's rejection of the twenty-four year period or the market price proxy. The department's rejection of the twenty-four year period and the market price proxy without adequate explanation therefore was an error of law.

Perhaps the most serious flaw in the department's analysis, however, is its implication that, if fixed costs can be recovered from Hudson ratepayers remaining after Stow's departure, they are not stranded. It is the department's duty to protect ratepayers from the side effects of newly introduced competition, such as increased rates due to the departure of customers. See *MIT, supra* at 872 & n.38.

The department insists that, because Hudson's rates will decline with or without Stow, there is no harm to Hudson ratepayers. It is true that Hudson's per-megawatt costs will decrease over time as it buys additional power at lower market prices. The department ignores, however, the fact that Hudson's ratepayers will still pay higher rates with Stow's departure from the system than if Stow were to remain. This is a violation of the principle that no class of customers should benefit at another's expense. The natural consequence of the department's decision is that Hudson ratepayers will bear all the costs under the PSAs, while Stow ratepayers will bear none.

Finally, the department suggests that because Hudson has no excess capacity, and indeed, will have to buy more power to serve its increasing load, the costs are not stranded. For example, Hudson, apparently, will be supplying power to a new customer's microchip plant, and so it will have no "stranded megawatts." From this, the department concludes that stranded costs do not exist. The department's apparent reasoning that a lack of stranded megawatts translates to a lack of stranded dollars is erroneous. Although Hudson can sell the megawatts that Stow would have purchased, it cannot obtain the same rates for them. If it attempted to do so, new customers would buy their power elsewhere. Neither the lack of excess capacity nor the existence of an increasing load, negates the conclusion that stranded costs exist. Rather, if capacity released by a departing customer remains unsold or may only be sold at a lower price, stranded costs do exist. This, we note, is in accordance with Federal policy on stranded costs in the electric transmission industry. See *Alma, Mich.*, 80 F.E.R.C. par. 61,265 (1997).

The department's discussion of mitigation, too, does not protect the public interest. The department found that Hudson

failed to establish that it had taken and will take all available and reasonable means to mitigate stranded costs. We have held that the burden is on the party that must otherwise pay, in this case, Stow, to prove that costs could be mitigated. See, e.g., *Assad* v. *Berlin-Boylston Regional Sch. Comm.*, 406 Mass. 649, 656-657 (1990); *Food Specialties, Inc.* v. *John C. Dowd, Inc.*, 339 Mass. 735, 747-748 (1959). See also *Northeast Metro. Regional Vocational Sch. Dist. Sch. Comm.* v. *Massachusetts Comm'n Against Discrimination*, 31 Mass. App. Ct. 84, 90 (1991). Although the department is certainly entitled to depart from our practice, it must articulate its reasons for doing so and make subsidiary findings supporting its allocation of burdens. Nothing in D.P.U. 95-30 or the order before us does so.

The department also required Hudson to make mitigation efforts that were futile. The assistant attorney general argued that Hudson could try to negotiate a stranded-costs payment with Stow. This overlooks the fact that the parties' breakdown of negotiations brought this matter to the department. In these circumstances, the requirement that Hudson should have negotiated with Stow after negotiations broke off is not realistic. The assistant attorney general also argued that Hudson should try to renegotiate its PSAs. In its opinion the department mentioned without elaboration renegotiating contracts as a factor to consider. There is no persuasive reason why the sellers of power under those contracts would accept a lower payment than agreed to by contract. Moreover, after our holding in *Massachusetts Mun. Wholesale Elec. Co.* v. *Danvers*, 411 Mass. 39 (1991), we expect the other participants in the PSAs to fight vigorously against releasing Hudson from its obligations, for such a release would likely invoke step-up provisions and increase the other participants' costs. We have never required a party to go through futile motions to prove nonmitigability of damages, and in our view, the department's requiring Hudson to do so was error.

On remand, the department should consider whether an award of stranded costs would be in accordance with the public interest in fair competition, equal treatment, reliable service, low rates, and other factors relevant to the department's duty to protect ratepayers. If the award is to reflect mitigation, the department should identify the basis for mitigation, explain why Hudson should reasonably be expected to employ it, and

calculate the dollar amount. For all aspects of this analysis, the department must adhere to its obligation to protect the interests of all ratepayers, not just departing customers.

6. *Conclusion.* The case is remanded to the county court where judgment should be entered affirming the department's order on valuation and consequential damages. The issue of stranded costs is remanded to the department for further proceedings consistent with this opinion.

*So ordered.*

APPENDIX.

General Laws. c. 164, § 43 (1996 ed.), provides:

"If a town which votes to establish a municipal lighting plant fails, within one hundred and fifty days from the passage of the final vote required by section thirty-five or thirty-six, to agree, as to price or as to the property to be included in the purchase, with any person or municipality engaged at the time of the first vote required by said section thirty-five or thirty-six in generating or distributing gas or electricity for sale for lighting purposes in such town and electing to sell, either such town or such person or municipality may apply to the department within thirty days after the expiration of said one hundred and fifty days for a determination as to what property ought in the public interest to be included in the purchase and what price should be paid, having in view the cost of the property less a reasonable allowance for depreciation and obsolescence, and any other element which may enter into a determination of a fair value of the property so purchased, but such value shall be estimated without enhancement on account of future earning capacity or good will, or of exclusive privileges derived from rights in the public ways; and thereupon the department, after notice to the parties, shall give a hearing thereon and make the determination aforesaid. Such property shall include such portion of the property of such person or municipality within the limits of such town as is suitable for, and used in connection with, the generation or distribution of gas or electricity within such limits; provided, that such purchase shall include both a gas and electric lighting plant only if a single corporation owns or operates both such plants. Such price shall include damages, if any, which the department finds would be caused by the severance of the property proposed to be included in the purchase from other property of the owner. If any such property is subject to any mortgages, liens or other encumbrances, the department in making its determination shall provide for the deduction or withholding from the purchase price, pending discharge, of such sum or sums as it deems proper.

"If within thirty days after such determination shall have been made by the department, the owner shall notify the town of its acceptance of the determination as made by the department, and within a further period of thirty days shall tender a good and sufficient deed of conveyance to the city or town clerk of the property required by the department to be purchased, and shall then place said deed in escrow, the town shall have sixty days in which to accept

or reject said tender, and if it accepts shall have a further period of sixty days in which to pay to the owner the price determined as hereinbefore provided. Such acceptance or rejection in case of a city shall be by vote of its city council, or its commissioners if its government consists of a commission, and in case of a town shall be by vote at a town meeting. A rejection of the tender shall operate as a rescission of all votes theretofore passed for the establishment of a municipal lighting plant.

"Should the owner not file such acceptance and tender within the time so limited, the town may proceed to construct or otherwise acquire a municipal plant without further attempt to acquire the plant of such owner or any part thereof, provided, however, that in case of a city such action is authorized by vote of its city council, or of its commissioners if its government consists of a commission, and that in case of a town such action is authorized by vote at a town meeting."