NStar Electric Company (NStar) appeals from a decision of the Appellate Tax Board (board) denying its applications for the abatement of taxes assessed by the board of assessors of Boston (assessors) for fiscal years 2012 and 2013. We conclude that the board's decision is supported by substantial evidence and affirm.
1. Background. a. The legal framework. We begin with an overview of the applicable cases to provide context for our discussion. The assessors are responsible for making a "fair cash valuation" of property that is subject to taxation. G. L. c. 59, § 38. "Fair cash value" means "fair market value," or "the price an owner willing but not under compulsion to sell ought to receive from one willing but not under compulsion to buy." Boston Gas. Co. v. Assessors of Boston, 334 Mass. 549, 566 (1956).
In Massachusetts, there has been a presumption that the fair cash value of utility property equals its net book value.[2] Tennessee Gas Pipeline Co. v. Board of Assessors of Agawam, 428 Mass. 261, 263 (1998) (Tennessee Gas ). This presumption arose out of a strict policy that the Department of Public Utilities (DPU) used in regulating the rates that utilities charge to consumers. Boston Gas Co. v. Board of Assessors of Boston, 458 Mass. 715, 718-719 (2011). In determining the propriety of proposed rates, the DPU permits a utility to earn a reasonable return on investment, which is calculated as a percentage return on the utility's rate base. Id. at 718. The utility's rate base includes expenditures to buy property if that property is "used and useful to customers" and if the costs were "prudently incurred." Hingham v. Department of Telecomm. & Energy, 433 Mass. 198, 202 (2001). For ratemaking purposes, the value of property included in the rate base is net book value, and historically, the DPU would not allow for an increase in net book value when property sold. Boston Gas Co., 458 Mass. at 718. Thus, if a buyer paid a premium over net book value for an asset, that premium was excluded from the buyer's rate base and the buyer would not earn a rate of return on it. Id. This policy is known as the carry-over rate base rule.
As a result of the carry-over rate base rule, the Supreme Judicial Court stated that the net book value of utility property is the proper value for assessment purposes, absent "special circumstances" that would induce a buyer to pay more than net book value. Tennessee Gas, 428 Mass. at 263-264. A nonexhaustive list of these circumstances includes: (1) "[t]he return actually being earned by the utility may exceed ... the rate of return approved in the allowed rate"; (2) "the return allowed on the investment may exceed the return available in the market for an investment having the same or a greater risk"; (3) "the applicable rules of law governing agency decisions might be changed so as to make an investment in the company more attractive"; (4) there may be "potential for growth in a utility's business"; or (5) there may be "the possibility of finding a buyer that is not a public utility." Boston Edison Co. v. Board of Assessors of Watertown, 387 Mass. 298, 305-306 (1982) (Assessors of Watertown ). If one of these circumstances is present, the burden shifts back to the taxpayer to establish that the assessed value is in excess of the property's fair cash value. Boston Gas Co., 458 Mass. at 729.
b. Facts. The taxes at issue were assessed on NStar's personal property, specifically electric utility transmission and distribution property located throughout the city of Boston. For fiscal year 2012, the net book value of the property was $1.155 billion. The assessors, however, valued it at $1.586 billion. For fiscal year 2013, the net book value of the property was $1.182 billion, but the assessors valued it at $1.635 billion.
At a hearing before the board, NStar offered testimony from three fact witnesses familiar with NStar's operations and two expert witnesses, John Reed and David Moody. Reed was qualified as an expert in regulatory matters relating to utilities, including rate-making and valuation issues. He testified that he was not aware of any DPU rate cases that deviated from the carry-over rate base rule. Based on this testimony and his belief that no other special circumstances warranted a departure from net book value, Reed testified that the fair cash value of NStar's personal property was net book value. Reed further testified that he was not aware of any asset sales occurring over net book value.
Moody was qualified as an expert appraiser and discussed three different valuation methods in addition to net book value: an income approach known as the discounted cash flow approach, a sales comparison approach, and a reproduction cost new less depreciation (RCNLD) approach. Moody testified that his discounted cash flow approach accounted for the effects of the carry-over rate base rule. He further testified that he could not derive an indicator of value from a sales comparison approach and that he accorded his RCNLD approach no weight.[3] Ultimately, Moody relied on his discounted cash flow approach and on net book value in reaching his opinion that the fair cash value of NStar's personal property for both fiscal years was $1.2 billion.
The assessors offered testimony from their expert appraiser, George Sansoucy, who testified that the fair cash value of NStar's personal property for both fiscal years was $1.95 billion. Sansoucy developed indicators of value under three income approaches, a sales comparison approach, and an RCNLD approach. While Sansoucy testified that the best approach is the RCNLD approach, he used indicators from each of his approaches in reaching his opinion as to fair cash value. Sansoucy further testified that he did not rely on net book value because it is an accounting entry and not a valuation method.
The board found that a number of special circumstances would induce a buyer to pay more than net book value for NStar's personal property, including a policy change with respect to the carry-over rate base rule. Because Moody's opinion as to fair cash value failed to account for those special circumstances and instead heavily relied on the effects of the carry-over rate base rule, the board did not credit his testimony as to fair cash value.[4] While the board also did not credit Sansoucy's opinion as to fair cash value, the board did find that he successfully refuted NStar's "bald net book assertions." The board thus concluded that NStar failed to meet its burden of proof.
c. NStar's arguments on appeal. NStar's primary argument on appeal is that the record does not support the board's finding of special circumstances. NStar also argues that, regardless of whether there were special circumstances, it met its burden of proving that the assessors overvalued the property. Neither argument has merit.
2. Discussion. The board's decision will not be reversed or modified if it is based on substantial evidence and a correct application of the law. Boston Gas Co., 458 Mass. at 721. Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." Id., quoting Tennessee Gas, 428 Mass. at 262. This review "must take into account whatever in the record fairly detracts from its weight." Boston Gas Co., supra, quoting New Boston Garden Corp. v. Board of Assessors of Boston, 383 Mass. 456, 466 (1981). As long as there is substantial evidence to support the board's decision, "we defer to the board's judgment as to what evidence to accept and which method or methods of valuation to rely on." Boston Gas Co., supra, quoting Assessors of Watertown, 387 Mass. at 302. However, we must set aside the board's decision if "the evidence points to no felt or appreciable probability of the conclusion or points to an overwhelming probability of the contrary." Boston Gas Co., supra at 721-722, quoting Tennessee Gas, supra at 262.
a. Evidence as to special circumstances. We focus our discussion, as did the parties, on whether "the applicable rules of law or governing agency decisions might be changed so as to make an investment in the company more attractive." Assessors of Watertown, 387 Mass. at 306. In particular, the parties dispute whether the DPU's policy with respect to the carry-over rate base rule has changed. NStar contends that the board impermissibly relied on factual findings made in prior, unrelated cases in determining that the rule has changed. We disagree.
Both parties presented evidence on the carry-over rate base rule. NStar relied on Reed, who testified that he was not aware of any DPU rate case that that has deviated from the carry-over rate base rule. The assessors, on the other hand, relied on relevant DPU decisions made from 1993 to 2010 that describe how the carry-over rate base rule has changed. Those decisions were entered into the record as a joint submission and were properly before the board. NStar does not argue otherwise.
After listening to Reed's testimony and reviewing the DPU decisions, the board found that the DPU has abandoned a strict carry-over rate base rule. This finding was supported by the DPU decisions. In fact, the Supreme Judicial Court has discussed the same DPU decisions at length in prior cases and has reached the same conclusion. See Boston Gas Co., 458 Mass. at 722-724.
We provide a brief overview of that history here. In Boston Edison Co. v. Board of Assessors of Boston, 402 Mass. 1, 15 (1988), the Supreme Judicial Court affirmed the board's decision to value a utility plant above net book value based on the possibility that the DPU "might allow adjustments to a purchaser's rate base to reflect a prudent purchase price above the plant's net book cost." Subsequently, in 1994, the DPU officially formalized this shift in its policy with respect to the carry-over base rule in an order regarding mergers and acquisitions of utilities. See Guidelines & Standards for Acquisitions & Mergers, D.P.U. 93-167-A (1994). In that order, the DPU stated that it would "no longer follow the practice of denying acquisition premium recovery on a per se basis." Id. See Boston Gas Co., 458 Mass. at 722-723.
The Supreme Judicial Court has acknowledged the DPU's policy change in at least three cases since 1994. The first of those cases, Stow Mun. Elec. Dep't v. Department of Pub. Utils., 426 Mass. 341, 342-343 (1997), involved the sale of an electricity distribution system to the town of Stow. In its review of a decision setting the purchase price, the Supreme Judicial Court noted that it was not erroneous to conclude "that because the carry-over rate base rule might not apply to Stow, Stow should pay more than [net book value]." Id. at 347. In Attorney Gen. v. Department of Telecomms. & Energy, 438 Mass. 256, 259-260 (2002), the Supreme Judicial Court again acknowledged the DPU's policy change in affirming a rate plan that included acquisition premium. Finally, Boston Gas Co., 458 Mass. at 716, involved a tax abatement application similar to the one at issue here. The Supreme Judicial Court noted that the DPU decisions "amply demonstrate the type of regulatory change anticipated in [Assessors of Watertown ] justifying the use of a valuation methodology other than net book value." Id. at 724.
The board examined both this binding precedent and the prior DPU decisions. While NStar characterizes the board's analysis as impermissibly relying on factual findings made in prior cases, that characterization is not accurate. In its review of the DPU decisions, the board was not relying on factual findings made in those cases.[5] The board was instead analyzing how the DPU's use of the carry-over rate base rule has changed. This was precisely the type of analysis required of the board. See Stow Mun. Elec. Dep't, 426 Mass. at 347 (rejecting argument that Department of Public Utilities "impermissibly speculated by discussing possible regulatory change").
Reed's testimony that he was not aware of any case that has deviated from the carry-over rate base rule does not alter this analysis. This argument "may speak to the diminished probability of a buyer earning a return on an acquisition premium, but factors bearing on valuation need not be certainties before the board may consider how they would manifest in a hypothetical sale." Boston Gas Co., 458 Mass. at 724.
We now turn to the other special circumstances found by the board, including NStar having a higher rate of return than its 10.5 percent approved rate of return and NStar's potential for growth.[6] The board's findings were supported by substantial evidence, including: (1) data from an independent investment research and financial publishing firm showing a rate of return on NStar common equity ranging from 12.8 percent upwards and (2) Sansoucy's testimony that revenue will increase with additional sales of electricity in Boston. NStar's argument that Reed offered unrebutted testimony refuting these special circumstance is thus without merit.[7] While Reed certainly disagreed with Sansoucy's testimony, the credibility of witnesses and weight of the evidence are matters for the board. Boston Gas Co., 458 Mass. at 738.
b. Valuation evidence. Due to the existence of special circumstances that would induce a buyer to pay more than net book value, the burden shifted back to NStar to prove that the assessors overvalued the property. NStar points to the expert testimony of Reed and Moody and to the testimony of one fact witness, who testified that during an NStar merger, the property was assigned net book value.[8]
None of this evidence convinces us that there was "no felt or appreciable probability" to the board's conclusion that NStar failed to meet its burden of proof. Boston Gas Co., 458 Mass. at 721-722, quoting Tennessee Gas, 428 Mass. at 262. Moody and Reed both offered opinions as to fair cash value that in one way or another assumed the absence of special circumstances. As discussed, supra, the board had reason not to credit Reed's testimony regarding the absence of special circumstances. Reed also testified that he was not aware of any asset sales occurring over net book value.[9] However, this testimony had limited probative value in light of the fact that Reed further testified that there were very few asset sales and none that he knew of in New England. The asset sales that Reed was familiar with occurred decades ago.
In addition, we note that while the board did not credit any of the experts' opinions as to fair cash value, the board did find that Sansoucy successfully refuted NStar's "bald net book assertions." This finding is supported by substantial evidence, including Sansoucy's testimony that net book value is an accounting entry and not a valuation method. We cannot conclude on the basis of this record that NStar met its burden of proof.
3. Conclusion. The board did not err in finding that there were special circumstances that would induce a buyer to pay more than net book value for NStar's personal property or in concluding that NStar failed to meet its burden of proving that the assessors overvalued the property.
Decision of the Appellate Tax Board affirmed.

Net book value has been defined as "the original cost of the property at the time it was originally devoted to public use, less accrued depreciation." Tennessee Gas Pipeline Co. v. Board of Assessors of Agawam, 428 Mass. 261, 263 (1998).

Even though Moody did not rely on his RCNLD approach, we note that this approach, too, assumed that any buyer would be subject to the carry-over rate base rule.

While the board did not make any specific findings with respect to Reed's opinion that the fair cash value of NStar's personal property was net book value, this opinion was based on Reed's conclusion that no special circumstances warranted a departure from net book value, a conclusion that the board clearly rejected.

NStar's argument that Boston Gas Co., 458 Mass. at 720-721, involved findings as to other special circumstances not present here thus does not advance NStar's position, as the board did not rely on those findings.

The board further relied on additional special circumstances not specified in Assessors of Watertown, 387 Mass. at 305-306, which we need not discuss in detail as the record supports the existence of several other special circumstances.

NStar's reliance on New Boston Garden Corp., 383 Mass. at 470, is unpersuasive as that case did involve unrebutted and corroborated testimony.

Reed also offered similar testimony that during utility mergers, property is assigned net book value and that any amount over that is recorded as goodwill. This testimony does little to bolster NStar's case, as the very question the board had to decide was whether the fair market value of the property was higher than the value NStar assigned to it.

NStar again faults the board for not making any specific findings regarding Reed's asset sale testimony. We need not address this argument because we assume for purposes of our analysis that the board credited Reed's testimony that he was not aware of any asset sales occurring over net book value.